626 S.E.2d 341

**In the Matter of Donald A. KENNEDY, Jr., Respondent.**

**No. 26111.**

Supreme Court of South Carolina.

Submitted Dec. 22, 2005.

Decided Feb. 6, 2006.

Henry B. Richardson, Jr., Disciplinary Counsel, and Susan M. Johnston, Deputy Disciplinary Counsel, both of Columbia, for the Office of Disciplinary Counsel.

Desa A. Ballard, of West Columbia, for respondent.

PER CURIAM:

In this attorney disciplinary matter, respondent and the Office of Disciplinary Counsel (ODC) have entered into an Agreement for Discipline by Consent pursuant to Rule 21, RLDE, Rule 413, SCACR. In the agreement, respondent admits misconduct and consents to disbarment pursuant to Rule 7(b), RLDE, Rule 413, SCACR. In addition, respondent agrees to pay restitution to clients, banks, and other persons and entities who have incurred losses as a result of his misconduct. We accept the agreement and disbar respondent from the practice of law in this state. The facts, as set forth in the agreement, are as follows.

## *FACTS*

### *Matter I*

Respondent had previously represented Complainant A in a quiet title action involving real property. Thereafter, Com-

plainant A became involved in or was threatened with litigation involving easements related to the real property that was the subject of the previous quiet title action. With respondent's acquiescence, Complainant A delivered his file related to the easement issue to respondent's office for review. Approximately two (2) months went by without Complainant A hearing from respondent on this matter.

Complainant A tried without success to contact respondent about the matter and then launched an intensive campaign to contact respondent at his office. Complainant A also wrote respondent several "heated" letters which respondent found offensive. Thereafter, respondent left a voice message on Complainant A's home answering machine which contained abusive and profane language about the matter. Complainant A stated that this message was heard by his wife and children.

When Complainant A went to retrieve his file from respondent, respondent made a remark which Complainant A interpreted as respondent was going to "create a problem for [Complainant A]" or words of similar import and effect.

Respondent never agreed to undertake the easement matter other than to review the file on the issue. After reviewing the file, considering his relationship with Complainant A, and considering his other workload, respondent decided he did not want to undertake to represent Complainant A in the easement matter and so advised him. Respondent now recognizes he should not have used abusive or profane language in dealing with Complainant A, that he should have been more prompt in deciding whether or not to undertake representation in the easement matter, that his communications with Complainant A about whether or not he would undertake the matter were not as they should have been, and that the file should have been returned to Complainant A if respondent was not going to undertake representation of Complainant A in the new matter.

## Matter II

Complainant B transmitted money to respondent to fund two real estate transactions. The first transaction was closed with a profit to Complainant B. As a result, there should have been approximately $7,000 in one of respondent's trust ac-

counts to be applied toward the closing of the second transaction. In contemplation of closing the second transaction, Complainant B also transmitted additional money to respondent which should have left a balance in respondent's trust account in excess of $20,000 belonging to Complainant B.

Complainant B was later advised by a non-attorney employee on respondent's staff that the second transaction had not been closed, that the file had been turned over to another attorney, and that there were insufficient funds in respondent's trust account to refund the money to Complainant B. The title insurance company involved in this transaction made a partial refund to Complainant B, but denied liability for the balance inasmuch as respondent had not caused an insured closing letter to be issued in connection with the transaction. As a result, Complainant B suffered a loss of approximately $18,000. Respondent acknowledges that the cause of this loss was the fact that he misappropriated all or at least a substantial portion of the funds and/or applied them toward purposes other than intended without the consent or knowledge of Complainant B.

## Matter III

Respondent served as a qualified tax intermediary in a Section 1031 Tax Deferred Exchange in connection with a real estate transaction where Complainant C was the initial seller and sought to locate replacement property for a like-kind exchange. As a result, approximately $40,000 was turned over to respondent. This money was deposited into one of respondent's trust accounts and was supposed to be held by respondent to be expended in connection with that transaction upon direction of the beneficiary for which the funds were being held. Thereafter, respondent misappropriated those funds in their entirety or used the entire amount of those funds for purposes other than intended without the knowledge or consent of Complainant C.

Complainant C made a claim to the Lawyers' Fund for Client Protection (Lawyers' Fund). The Lawyers' Fund approved a payment to Complainant C in the amount of $20,000 (the maximum payment that could be made under the applica-

ble rules to a single complainant) leaving Complainant C with a financial loss as a result of respondent's misconduct.

## Matter IV

Complainant D is an attorney who specialized in tax matters. Complainant D and respondent were, for a period of time, law partners operating under as a limited liability company (LLC). This LLC was for the limited purpose of handling Section 1031 tax deferred real estate exchanges. Otherwise, respondent and Complainant D maintained separate law practices. Complainant D terminated his relationship with respondent after he determined respondent had engaged in professional misconduct on several occasions and in the several matters set forth below.

## A.

Respondent decided to refinance his personal residence with a bank loan. Respondent requested Complainant D conduct the title search, review the closing documents, and serve as the settlement agent, including executing the HUD–1 Settlement Statement as closing attorney/settlement agent in connection with the refinancing. Complainant D was scheduled to be out of state on the day of the closing of the refinancing transaction. For that reason, Complainant D and respondent agreed that the loan proceeds would be deposited into one of respondent's trust accounts and disbursed by respondent.

The original HUD–1 Settlement Statement signed by Complainant D showed payoffs to several other lenders who had prior liens on the property and showed very little or no "cash to borrower." Complainant D signed page two of the HUD–1 Settlement Statement as "settlement agent." Thereafter, respondent drafted or caused to be drafted a new page one of the HUD–1 Settlement Statement. This new HUD–1 provided a disbursement to respondent (i.e., "cash to borrower") of approximately $157,266 and omitted the payoffs to the other lenders that were supposed to be paid according to the original HUD–1 signed by Complainant D. Complainant D had not authorized and did not know about the new page one until after the closing and disbursements in connection with the transaction.

Respondent received loan proceeds from the lender in the amount of $280,000 in connection with the refinancing transaction. He did not pay off the holders of the prior liens and, instead, converted and used approximately $157,266 for purposes other than intended by or known to the lender. As a result, these prior liens remained senior in priority to the lien of the refinancing lender.

In connection with the refinancing transaction, respondent asked Complainant D to execute the loan policy of title insurance on behalf of the title insurance company as his "licensee." Respondent assured Complainant D that he could, under respondent's agency agreement with the title insurance company, authorize Complainant D to sign the title insurance policy on behalf of the title company as "licensee" of respondent.[1] In reliance on respondent's assurance, Complainant D signed his own name to the loan title insurance policy on behalf of the title insurance company.

Respondent presented the title policy to the lender. The lender questioned certain aspects of the loan policy presented and required that an amended loan policy be issued containing certain additional requirements of the lender. Respondent then redrafted the loan policy, signed or allowed someone else to sign Complainant D's name to the loan policy on behalf of the title insurance company, and then presented this new loan policy to the lender bearing Complainant D's forged signature. In reliance on the provisions of this new loan policy, the lender tendered the loan proceeds to respondent.

The amended loan policy of title insurance reflects that the refinancing lender had a first mortgage lien on the subject property when, in fact, there were several prior and, therefore, superior liens on the subject property (respondent's residence) which was well known to respondent. The lender consummated the refinanced loan transaction in reliance on the information in the amended loan policy of title insurance which falsely certified that the refinancing lender had a first lien on the subject property.

---

1. Respondent's representation was not authorized by the title insurance company. Complainant D had no authority to sign the policy on behalf of the title insurance company.

*B.*

In another matter, respondent represented a client in connection with a Section 1031 exchange. While Complainant D was out of the state, the LLC received a $943,265.08 check in connection with this 1031 exchange. Respondent or someone acting on his behalf or under or subject to his direction and/or supervision endorsed this check "Pay to [Respondent's] Law Office" (not the LLC partnership). This check was then deposited into one of respondent's trust accounts. Respondent then prepared or caused to be prepared a check on that trust account transferring $943,265.08 into another trust account maintained by respondent at another bank.

Respondent ultimately disbursed funds on the 1031 tax deferred exchange, but one check issued in the amount of $77,543.52 by respondent on one of his trust accounts in connection with the exchange was not honored upon presentment due to insufficient funds in the trust account. Respondent admits the check was not honored because he had misappropriated these funds and/or converted the funds for purposes other than intended. The client made a claim for these funds with the title insurance company which made a payment to the client in the amount of $79,787.79.

## Matter V

On August 26, 2002, respondent was placed on interim suspension. *In the Matter of Kennedy,* 366 S.C. 468, 623 S.E.2d 640 (2002). Respondent acknowledges that, at that time, he had shortages in his trust account of approximately $280,000. Respondent further acknowledges that, immediately prior to his interim suspension, he had approximately thirteen bank accounts and that he failed to follow the recordkeeping and money handling requirements of Rule 417, SCACR, in connection with the various trust accounts. From time to time, respondent used money in his trust accounts which belonged to his clients to pay his personal expenses.

Respondent has represented to ODC that the cause of the acknowledged shortage in his trust accounts was the failure of a lender to wire loan proceeds into one of the trust accounts approximately twelve years ago. Respondent stated he incorrectly believed the funds had been wired into the trust account and closed a transaction and disbursed the proceeds reflected

in that transaction when he had not actually received the proceeds. However, respondent can neither remember nor identify the name of the lender who failed to wire those loan proceeds to his trust account and he cannot identify the client in that transaction.

ODC has determined and contends that the total shortage in respondent's trust account in fact grew to the approximate sum of $420,000 at the time respondent was placed on interim suspension. For purposes of this agreement, respondent does not contest that contention. However, respondent has represented to ODC that he suspects someone on his staff embezzled some money out of the trust account, thereby causing the known shortage of approximately $280,000 to increase to the actual amount thereof. Respondent has not been able to provide records to support his suspicion.

As a result of the shortage in his various trust accounts (whether the sum of $280,000 as acknowledged by respondent or the approximate sum of $420,000 as contended by ODC), respondent instituted a scheme of check kiting and/or moving money between his various bank accounts to cover the shortages. On at least one occasion, a bank required respondent to cover shortages in his personal account. Respondent paid the bank with numerous checks written on one or more of his law firm's trust accounts to cover the shortages.

The Lawyers' Fund has paid $68,596 in claims made against respondent as a result of his misconduct. The title insurance company mentioned herein reports that, as of August 19, 2004, it has paid damages in the amount of $836,421 as a result of claims made in connection with the foregoing activities of respondent. For purposes of this agreement, respondent does not dispute the title insurance company's claim.

### Matter VI

On or about March 10, 2005, respondent entered a plea of guilty to one count of mail fraud in violation of 18 U.S.C. § 1341 in the United States District Court for the District of South Carolina.

***

Respondent has cooperated with ODC's investigation into these matters, including submitting to voluntary interviews,

joining into a consent order releasing records to auditors, and consenting to being placed on interim suspension. Until this matter, respondent had never been found to have committed professional misconduct in South Carolina.

### LAW

■■ Respondent admits that, by his misconduct, he has violated the following provisions of the Rules of Professional Conduct, Rule 407, SCACR: Rule 1.1 (lawyer shall provide competent representation to a client); Rule 1.3 (lawyer shall act with reasonable diligence and promptness in representing a client); Rule 1.4 (lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information); Rule 1.15 (lawyer shall hold property of clients in the lawyer's possession in connection with a representation separate from the lawyer's own property); Rule 4.1 (in the course of representing a client, a lawyer shall not knowingly make a false statement of material fact to a third person); Rule 5.3 (partner in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that a non-lawyer employee's conduct is compatible with the professional obligations of the lawyer); Rule 8.4(a) (it is professional misconduct for a lawyer to violate the Rules of Professional Conduct); Rule 8.4(b) (it is professional misconduct for lawyer to commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects); Rule 8.4(c) (it is professional misconduct for lawyer to engage in conduct involving moral turpitude); Rule 8.4(d) (it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation); and Rule 8.4(e) (it is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice).

Respondent further admits his misconduct is grounds for discipline under Rule 7, RLDE, of Rule 413, SCACR, specifically Rule 7(a)(1) (it shall be ground for discipline for lawyer to violate Rules of Professional Conduct), Rule 7(a)(5) (it shall be ground for discipline for lawyer to engage in conduct tending to pollute administration of justice, bring courts or legal profession into disrepute, or conduct demonstrating an unfitness to practice law), Rule 7(a)(6) (it shall be ground for

364

discipline for lawyer to violate oath of office), and Rule 7(a)(7) (it shall be ground for discipline for lawyer to willfully violate a court order). In addition, respondent admits his misconduct violated Rule 417, SCACR.

### CONCLUSION

■ We accept the Agreement for Discipline by Consent and disbar respondent. The disbarment shall be retroactive to the date of respondent's interim suspension. Within fifteen (15) days of the date of this opinion, respondent shall file an affidavit with the Clerk of Court showing that he has complied with Rule 30 of Rule 413, SCACR, and shall also surrender his Certificate of Admission to the Practice of Law to the Clerk of Court.

In addition, within thirty (30) days of the date of this order, ODC and respondent shall file a restitution plan with the Court. In the plan, respondent shall agree to pay restitution to all presently known and/or subsequently identified clients, banks, and other persons and entities who have incurred losses as a result of his misconduct in connection with this matter. Moreover, in the restitution plan, respondent shall agree to reimburse the Lawyers' Fund for any claims paid as a result of his misconduct in connection with this matter.

**DISBARRED.**

TOAL, C.J., MOORE, BURNETT and PLEICONES, JJ., concur.

WALLER, J., not participating.